UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| OSCAR TECUAPACHO MORALES, *administrator of the Estate of Felipe Rodriguez-Tzompantzi*,<br><br>Plaintiff,<br><br>v.<br><br>SAFEWAY GROUP, LLC, *et al.*,<br><br>Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br>1:21-cv-18504-KMW-EAP<br><br><br>**OPINION** |

**Tyler J. Stampone, Esq.**
STAMPONE LAW, P.C.
500 Cottman Avenue
Cheltenham, PA 19012

*Counsel for Plaintiff Oscar Tcupacho Morales, Administrator of the Estate of Felipe Rodriguez-Tzompantzi*

**Peter A. Lentini, Esq.**
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
200 Lake Drive East, Suite 300

*Counsel for Defendant Safeway Fresh Foods, LLC*

**William J. Martin, Esq.**
MARTIN, GUNN & MARTIN
216 Haddon Avenue, Suite 420
Westmont, NJ 08108

*Counsel for Defendant Safest-Way Labor Force, LLC*

**WILLIAMS, District Judge:**

**I.    INTRODUCTION**

Before the Court are the Motions for Summary Judgment filed by defendants Safeway Fresh Foods, LLC and Safest-Way Labor Force, LLC (together, "Defendants") pursuant to Federal

1

Rule of Civil Procedure 56. Defendants' Motions are opposed by plaintiff Oscar Tecuapacho Morales ("Plaintiff"), who has brought this wrongful death and survival action on behalf of the Estate of Felipe Rodriguez-Tzompantzi. For the reasons set forth below, Defendants' Motions are granted.

## II.  BACKGROUND

### A.  Factual Background

This case arises out of a tragic workplace accident at a food processing facility in Vineland, New Jersey, which resulted in the death of Felipe Rodriguez-Tzompantzi ("Rodriguez").[1] The facility is owned and operated by defendant Safeway Fresh Foods, LLC ("Fresh Foods"), a food manufacturer that prepares and packages soups, salads, and other fresh-food products for retail-end sale. (ECF No. 60-3 ¶ 5.) Defendant Safest-Way Labor Force, LLC ("Safest-Way") is a related company operating under the Fresh Foods umbrella and was established solely to obtain and provide the labor force for Fresh Foods' operations. (ECF No. 59-3 ¶ 14.) Rodriguez had been employed by Safest-Way since 2014 and worked continuously at Fresh Foods' facility as a nightshift sanitation worker, cleaning the machines that were used during the day to process its products. (*Id.* ¶¶ 3, 6, 8.)

On January 18, 2020, Rodriguez was cleaning an electrically powered, inclined conveyor machine that was used to move vegetable scraps and other food waste with a rotating belt from one room and into another. (ECF No. 57-2 ¶ 51.) At some point, Rodriguez's hooded sweatshirt was caught in one of the machine's rotating parts, asphyxiating him. (*Id.* ¶ 7.) There were no witnesses to this incident, and it is not known precisely when this occurred. Though, it appears

---

[1] The Court exercises diversity of citizenship jurisdiction over this matter pursuant to 42 U.S.C. § 1332. Plaintiff and Rodriguez's estate are both citizens of Pennsylvania; Defendants are citizens of New Jersey.

from the record that Rodriguez was discovered not long thereafter by co-workers, who then freed him from the machine and attempted to resuscitate him. (ECF No. 60-3 ¶¶ 139–140.) Paramedics also arrived and continued those efforts, sadly to no avail. (ECF No. 61-13 at 3.) A hospital physician later estimated that Rodriguez had died at approximately 12:52 a.m. (*Id.*)

For six years, Rodriguez had cleaned this machine nightly without issue. (ECF No. 59-3 ¶ 6.) This time, however, Rodriguez's sweatshirt had become trapped in the machine's "sprockets"––a set of gear-like wheels lying directly beneath the conveyor belt that mechanically turn it when the machine is being operated. (ECF No. 57-2 ¶¶ 2–3.) Explaining this accident is not a matter of mere exposure to these sprockets, as cleaning the machine necessarily entails exposing the sprockets. (*Id.* ¶¶ 4–6.) The issue, rather, is that the machine was turned on after Rodriguez had already removed the belt and exposed the sprockets. (*Id.* ¶¶ 7–8.)

The process for sanitizing the machine does not appear to have been formalized in any written instruction or manual. As far as the Court can discern, Rodriguez and other sanitation workers cleaned the conveyor machine in essentially five steps:

(1) *First Cleaning*: The machine and belt are hose-rinsed with water while the machine is on and rotating. (*Id.* ¶¶ 49–50.)

(2) *De-Energize*: The machine is turned off and will remain off for the remainder of the cleaning. (*Id.* ¶ 51.)

(3) *Belt Removal*: The belt is removed from the conveyor by releasing a pin at one of the machine's joints. The machine must be off at this step, as it is not possible to remove the pin while the belt is rotating. This is also the point at which the machine's sprockets are exposed. (*Id.* ¶¶ 4–6, 51.)

(4) *Second Cleaning*: While the machine is still off, the machine's frame and belt are separately soaped and hose-rinsed with water. Food waste is also swept from the floor and removed. (ECF No. 59-3 ¶ 26.)

3

(5) *Belt Replacement*: Once cleaned, the belt is placed back on the machine and refastened with the pin. Here too, the machine must remain off, otherwise the belt cannot be re-fastened. (ECF No. 57-2 ¶ 53.)

Although there were no witnesses to the incident, the circumstantial evidence in this case appears to establish that Rodriguez had, in fact, turned the machine off during the cleaning process. When Rodriguez was found, the conveyor belt had already been removed and he was sweeping around the machine with a broom. (*Id.* ¶¶ 4–6, 51.) Thus, the machine must have been turned back on after the belt was removed and the sprockets were exposed. While the parties seem to acknowledge as much, they do not know how or why it was turned back on. (*Id.* ¶¶ 54–58; ECF No. 59-3 ¶¶ 17–21.) Indeed, multiple employees have expressed similar confusion and have testified that there was simply no need for Rodriguez to turn the machine back on after the belt was detached. (ECF No. 59-3 ¶¶11–13.)

According to Plaintiff, whether Rodriguez turned the machine on deliberately or accidentally is immaterial, as both scenarios could have been prevented had Defendants implemented adequate safety measures, namely a proper "lockout/tagout" procedure ("LOTO"). As described by the U.S. Occupational Safety and Health Administration ("OSHA"), "lockout" entails a worker's placement of a physical locking device on a piece of machinery that ensures it is properly shut off and prevents it from being turned on during servicing. *See* 29 C.F.R. § 1910.147(b) (2011). "Tagout" involves the worker's placement of a warning tag with the lock to identify the worker and indicate the reason for the lockout. *See id.* Where applicable, these regulations require employers to implement LOTO protocols and enforce compliance against affected employees so as to prevent "unexpected energization or start up." *Id.* § 1910.147(a)(1)(i).

It is undisputed that although Fresh Foods had LOTO policies in place, Rodriguez and other sanitation workers were not subjected to them or otherwise trained to deploy them. It is also

undisputed that only Fresh Foods' maintenance workers were trained on those policies. Fresh Foods explains that although the maintenance workers mandatory deployment of LOTO depended on the machine and the task required, they were also required to use LOTO when performing mechanically invasive tasks that could trigger startup during maintenance, such as removing a machine's electronic parts. (ECF Nos. 66-3, 66-4.) Fresh Foods further reasons that its sanitation workers performed different, less dangerous work, and thus were not required to use LOTO.

Following Rodriguez's death, an OSHA investigator concluded that Rodriguez died "while he was cleaning around a machine (trash belt) with moving parts." (ECF No. 61-16 at 15.) It was also found that sanitation employees turned the conveyor off when removing or reinstalling the belt, but that they were not required to use LOTO when doing so. (*Id.* at 21.) The investigator also interviewed Safest-Way supervisor, David Gallo, who stated that he had started working with the company four months prior and was in the process of creating a LOTO program, but that it was not implemented before the fatality occurred. (*Id.* at 21.) OSHA consequently cited Safest-Way for failing to implement a LOTO protocol. (*Id.* at 2–7.)

On October 13, 2021, Plaintiff initiated the instant action in his capacity as administrator of Rodriguez's estate. Seeking compensatory and punitive damages in connection with Rodriguez's death, he asserts various tort-based claims against both Defendants and generally alleges that they failed to train and subject Rodriguez to a proper LOTO protocol.[2]

### B. Legal Framework

Following his death, Rodriguez's dependents received workers' compensation benefits under the New Jersey Workers' Compensation Act ("NJWCA"). *See* N.J. STAT. ANN. §§ 34:15–1

---

[2] These claims are set forth in Plaintiff's Second Amended Complaint.

*et seq.* Plaintiffs' present claims, which continue to be governed by the NJWCA, implicate two discreet but related issues.

First, there is the issue of statutory immunity. The NJWCA established a social insurance program that ensures employees, or their dependents, receive compensation for lost wages, medical care, and other costs incurred from a workplace injury or death. *See Talmadge v. Burn*, 142 A.3d 757, 759 (N.J. Super. Ct. App. Div. 2016). That compensation, however, is part of a well-known "trade-off" whereby employees relinquish "their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment." *Millison v. E.I. du Pont de Nemours & Co.*, 501 A.2d 505, 512 (N.J. 1985). In exchange for requiring employers "to provide swift and certain payment, without regard to fault, to employees for workplace injuries," the NJWCA immunizes them from tort liability for those same injuries. *Van Dunk*, 45 A.3d at 971.

This statutory bar against tort actions for workplace injuries is codified in the NJWCA's "exclusive remedy" provision, which also sets forth a narrow exception for injuries resulting from an employer's intentional wrongdoing:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, *except for intentional wrong*.

N.J. STAT. ANN. § 34:15–8 (emphasis added). This statutory bar applies to all tort claims, regardless of whether asserted by the employee or by another on behalf of a decedent's estate.

Second, to the extent such immunity applies, Plaintiff's claims here also raise the question of who exactly may assert it. As previously mentioned, while Rodriguez was technically employed by Safest-Way, he worked exclusively for Fresh Foods and did so at the same processing facility for nearly six years before his death. It is well settled that an employee may be considered to have

two employers for purposes of the NJWCA, "both of whom may be liable to him in compensation." *Blessing v. T. Shriver & Co.*, 228 A.2d 711, 713 (N.J. Super. Ct. App. App. Div. 1967). Consequently, "the acceptance of workers' compensation benefits from one employer will preclude a common law tort action brought by the employee against another employer." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 244 (3d Cir. 2004) (citing *Blessing*).

### III.  LEGAL STANDARD

A court may grant summary judgment when the materials of record "show[ ] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a *genuine issue for trial*.''" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *See Anderson*, 477 U.S. at 256–57. "A non-

7

moving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV. DISCUSSION

In their Motions, both Defendants seek summary judgment based on the immunity offered by the NJWCA's exclusive-remedy provision. The parties do not dispute that Safest-Way was Rodriguez's direct employer and thus has the obvious standing to do so. However, before addressing the merits of that challenge, the Court must first determine whether Fresh Foods may also invoke those protections as Rodriguez's "special employer."

### A. Special Employer Doctrine

In analyzing situations in which an employee may be found to have both a primary employer and a "special employer," New Jersey state courts have developed and applied a five-factor test:

(1) the employee has made a contract of hire, express or implied, with the special employer;

(2) the work being done by the employee is essentially that of the special employer;

(3) the special employer has the right to control the details of the work;

(4) the special employer pays the employee's wages; and

(5) the special employer has the power to hire, discharge or recall the employee.

*Hocutt v. Minda Supply Co.*, 235 A.3d 1047, 1052 (N.J. Super. Ct. App. Div. 2020). None of these factors is necessarily dispositive, and not all five must be satisfied for a special employment

relationship to exist. *See Marino*, 358 F.3d at 244. Even so, courts have historically emphasized the importance of the third factor—the right to control. *See, e.g.*, *Volb v. Gen. Elec. Capital Corp.*, 651 A.2d 1002, 1005 (N.J. 1995) ("[T]he most important factor in determining a special employee's status is whether the borrowing employer had the right to control the special employee's work.").

Turning to the facts of this case, the Court first finds that there existed, at the very least, an implied, consensual employment relationship between Rodriguez and Fresh Foods. It appears from the record that Safest-Way was formed specifically for the purpose of obtaining and supplying labor exclusively for Fresh Foods. For six years, Rodriguez and other Safest-Way employees voluntarily reported to the same Fresh Foods facility for work and accepted instructions from Fresh Foods supervisors. Thus, the Court concludes that Rodriguez impliedly consented to a special employer-employee relationship with Fresh Foods. *See Hocutt*, 235 A.3d at 1053 (finding implied special relationship where employee of staffing agency reported to work at a warehouse and accepted instructions from the warehouse supervisor); *see also Antheunisse v. Tiffany & Co.*, 551 A.2d 1006, 1008 (N.J. Super. Ct. App. Div. 1988) (finding plaintiff had "impliedly contracted with defendant when she reported voluntarily to work" and proceeded to "submit to defendant's direction and control").

Though the remaining four factors do not appear to be in genuine dispute, the Court confirms that they are indeed established by the evidence of record. Rodriguez's work was "essentially that of the special employer" because his daily assigned tasks were always directly related and integral to Fresh Foods' processing operation. *See Hocutt*, 235 A.3d at 1053 (finding second prong satisfied where employee's "assigned tasks were directly related to [special employer's] dry cleaning warehouse business"). Further, and most importantly, Fresh Foods had

the right to control the assignments and tasks of every Safest-Way employee, including Rodriguez. *See Kelly v. Geriatric & Med. Servs., Inc.*, 671 A.2d 631, 636 (N.J. Super. Ct. App. Div. 1996) (finding third prong satisfied where plaintiff's "work duties and job performances were assigned, directed and overseen" by special employer), *aff'd sub nom. Kelly v. Geriatric & Med. Centers, Inc.*, 685 A.2d 943 (N.J. 1996). Prong four is also satisfied because Fresh Foods paid wages directly to Safest-Way, which were in turn passed on to Safest-Way workers, including Rodriguez. *See Walrond v. Cnty. of Somerset*, 888 A.2d 491, 497 (App. Div. 2006) (observing that fourth prong is satisfied where special employer pays employee "directly or indirectly through fees to the general employer"). Lastly, Fresh Foods always had the authority to hire, fire, or recall Rodriguez. *See Kelly*, 671 A.2d at 636 (noting that fifth prong can be satisfied by evidence of a formal power to discharge or a "functional equivalent," such as a business's ability to determine whether an employee will "ever again work at any of its [ ] facilities").

The question of whether an employment relationship exists is reserved for a jury when there is a genuine dispute in the evidence. *See Nikorak v. FedEx Corp.*, No. 11-7015 SDW, 2015 WL 93750, at *4 (D.N.J. Jan. 7, 2015). Here, no such dispute exists, and the question is accordingly one of law. The record plainly demonstrates that Rodriguez, though technically employed by Safest-Way, was also a special employee of Fresh Foods. All five of the special-employer factors weigh in favor of Fresh Foods, and Plaintiff has provided no legally relevant reason why any of them should be disregarded. Thus, the NJWCA's exclusive-remedy provision applies to both Fresh Foods and Safe-Way Labor. *See Blessing*, 228 A.2d at 713.

B. **Intentional-Wrong Exception**

Defendants' immunity from suit pivots on whether Plaintiff can prove that they committed an "intentional wrong" that caused Rodriguez's death. *See* N.J. STAT. ANN. § 34:15–8. The statute itself does not define "intentional wrong" or otherwise give any indication as to what exactly it might entail. The current understanding of the term originates with *Millison v. E.I. du Pont de Nemours & Co.*, a case in which the New Jersey Supreme Court considered "what level of risk-exposure is so egregious" as to rise to a level of "intentional wrong." 501 A.2d 505, 514 (N.J. 1985). There, the court interpreted "intentional wrong" to encompass deliberate acts taken with the knowledge that harm was "substantially certain" to follow. *Id.* This essential holding was later refined and synthesized into a two-part test:

> [I]n order for an employer's act to lose the cloak of immunity of [§] 34:15–8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the [NJWCA] to immunize.

*Laidlow v. Hariton Mach. Co.*, 617, 790 A.2d 884, 894 (N.J. 2002). The first part of this test is known as the "conduct prong," and the second, the "context prong." *Id.*

Turning first to the conduct prong, the Court observes at the outset that this is an "exceedingly demanding" element to satisfy. *Lopez v. Corozal Auto Repair Inc.*, No. 21-17366, 2024 WL 1930844, at *5 (D.N.J. May 2, 2024). It requires a plaintiff to come forward with evidence that the employer committed an "affirmative, deliberate act" while knowing that injury or death were "substantially certain" to follow therefrom. *Busby v. Seabrook Bros. & Sons, Inc.*, No. A-1925-21, 2024 WL 3648144, at *9 (N.J. Super. Ct. App. Div. Aug. 5, 2024). As the New Jersey Supreme Court has explained:

11

> [T]he mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong.

*Van Dunk v. Reckson Assocs. Realty Corp.*, 45 A.3d 965, 972 (N.J. 2012) (quoting *Millison*, 501 A.2d at 514). It is not enough that "a known risk later blossoms into reality." *Id.* Rather, the standard "demand[s] a virtual certainty." *Id.*

Here Plaintiff contends that he has presented sufficient evidence to create an issue of fact with respect to the conduct prong of the substantial certainty test. He submits that cleaning the conveyor was so obviously and patently dangerous that their failure to subject Rodriguez to a LOTO procedure rose to the level of an intentional wrong. Plaintiff reasons that this omission, combined with the Defendants' failure to train Rodriguez on the same, created a work environment that was "substantially certain" to result in Rodriguez's death.

Generally speaking, an employer's failure to follow safety regulations or adhere to good safety practices cannot sustain a finding of an intentional wrong unless "it is accompanied by something more, such as deception, affirmative acts that defeat safety devices, or a willful failure to remedy past [OSHA] violations." *Bove v. AkPharma Inc.*, 213 A.3d 948, 959 (N.J. Super. Ct. App. Div. 2019). The New Jersey Supreme Court has "consistently held that an employee's injury must have been caused by an employer's *affirmative, deliberate act* in order to constitute an 'intentional wrong' for purposes of the exclusionary provision of the [NJWCA]." *Busby*, 2024 WL 3648144, at *9 (emphasis added). Thus, Defendants' "failure to implement LOTO procedures," standing alone, is "not enough to satisfy the virtual certainty requirement." *Id.* Plaintiff must therefore come forward with other evidence demonstrating that Defendants knew that its LOTO-related failures were "virtually certain" to result in Rodriguez's death. *Van Dunk*, 45 A.3d at 978.

12

In his Opposition to Defendants' Motion, Plaintiff primarily offers a detailed recitation of the well-known, post-*Millison* line of cases in which employees were found to have produced sufficient evidence to prove their employers' intentional wrong. *See Millison*, 501 A.2d 505 at 514; *Laidlow*, 790 A.2d at 897; *Mull v. Zeta Consumer Prod.*, 823 A.2d 782, 786 (N.J. 2003); *Crippen v. Cent. Jersey Concrete Pipe Co.*, 823 A.2d 789 (N.J. 2003). He then submits that this case presents analogous facts that are likewise sufficient to defeat summary judgment. The Court disagrees.

The cases on which Plaintiff relies stemmed from "rare and extreme factual circumstances." *Kibler v. Roxbury Bd. of Educ.*, 919 A.2d 878, 882 (App. Div. 2007). This case does not present those circumstances. On countless occasions, New Jersey courts have discussed those very same cases at length and extracted from them their common, egregious elements. This Court will not replicate those efforts, as the New Jersey Supreme Court has already provided the basis to distinguish *Millison* and its progeny:

> What distinguishes *Millison*, *Laidlow*, *Crippen*, and *Mull* from the present matter is that those cases all involved the employer's affirmative action to remove a safety device from a machine, prior OSHA citations, deliberate deceit regarding the condition of the workplace, machine, or, in the case of *Millison*, the employee's medical condition, knowledge of prior injury or accidents, and previous complaints from employees. In particular, this Court was mindful in those cases of the durational aspect of the employer's intentional noncompliance with OSHA requirements or other demonstrations of a longer-term decision to forego required safety devices or practices. The circumstances here are in sharp contrast to the removal of a safety device on a machine on which an employee is expected to continue operating.

*Van Dunk*, 45 A.3d at 978.

This case does not concern an employer's affirmative act of disabling a safety feature on a piece of dangerous machinery, but rather Defendants' failure to implement proper LOTO procedures. *See Busby*, 2024 WL 3648144, at *9 (distinguishing *Millison*, *Laidlow*, *Crippen*) (contrasting employer's "failure to implement LOTO procedures" with the "deliberate" removal

13

of safety device). There is no evidence that Defendants engaged in a persistent, long-term, or egregious pattern of ignoring prior accidents, injuries, close calls, or safety complaints concerning the conveyor machine. *See, e.g.*, *Crippen*, 823 A.2d at 796 (discussing employer's refusal to correct safety violations for eighteen months prior to plaintiff's death). Nor is there any evidence that Defendants had "deliberately failed to correct [any] OSHA violations" or that they had "intentionally deceived OSHA" over a prolonged period of time "into believing that it had abated the violations." *Laidlow*, 790 A.2d at 897 (finding that employer had "deliberately" and "systematically deceived OSHA" for over thirteen years "into believing that [a] machine was [safe]").

Implicitly acknowledging that this case is unlike *Millison* and the others, Plaintiff proceeds to cite to a portion of *Van Dunk* where the New Jersey Supreme Court anticipated that "a single egregiously wrong act by an employer might, in the proper circumstances, satisfy the intentional-wrong standard." 45 A.3d at 980. Plaintiff argues that *Van Dunk* thus "opens the door" for him to prove that Defendants' omission rose to the level of an intentional wrong. (ECF No. 62 at 13.) To this end, he primarily relies on three pieces of evidence.

First, Plaintiff points to a portion of a PowerPoint slide that was shown during a March 2019 meeting of Fresh Foods' Safety Committee. (ECF No. 60-3 ¶ 129.) The slide summarizes a November 2018 OSHA Press Release concerning a citation imposed on a separate, unnamed manufacturer for failing to employ LOTO after a sanitation worker had sustained finger injuries on an unspecified machine. (*Id.*) Based on this slide, Plaintiff reasons that Defendants were previously on notice of the necessity of LOTO. Perhaps that is true. But a "generalized awareness that there are dangerous hazards involved in the work and environment of [sanitation] employees is not sufficient to demonstrate substantial certainty." *Glass v. United Parcel Servs.*, No. 19-19839,

14

2023 WL 4287202, at *9 (D.N.J. June 30, 2023). Stated differently, this evidence does not "transform the company's negligence or recklessness into intentional wrong." *Hocutt*, 235 A.3d at 1059; *see also Mabee v. Borden, Inc.*, 720 A.2d 342, 349 (N.J. Super. Ct. App. Div. 1998) (noting that employer "was aware that fifteen months before plaintiff's injury" another of its own employees had "injured his hand in the [same] unguarded [machine] while undertaking essentially the same cleaning procedure undertaken by plaintiff").

Next, Plaintiff submits that a certain "co-worker admission" is sufficient to prove that Defendants knew Rodriguez's death was virtually certain to occur. (ECF No. 62 at 11.) He specifically points to a portion of the deposition testimony taken from Safest-Way employee, David Alvarado, in which he agreed that it was "substantially certain" that Rodriguez could have been hurt or killed due to the lack of LOTO measures. Citing to *Crippen*, Plaintiff submits that this admission is sufficient to meet the substantial certainty standard. It is not.

In *Crippen*, the plaintiff sued her deceased husband's employer, arguing that its deliberate failure to correct prior OSHA violations constituted an intentional wrong that caused her husband's death. *See* 823 A.2d at 790. Those violations included, among other things, failing to "implement a LOTO procedure" and "train employees on LOTO procedures." *Id.* at 797. In holding that the evidence adduced was sufficient to defeat summary judgment, the New Jersey Supreme Court found that, eighteen months prior to the husband's death, OSHA had cited the employer for its LOTO-related failures and classified those citations as "serious"—a designation indicating "a substantial probability [of] death or serious physical harm." *Id.* at 792 (citing 29 C.F.R. 1960.2(v)). The employer not only "deliberately failed to correct the OSHA violations" during the eighteen months leading up to the husband's death, but that it had also "intentionally deceived OSHA into believing that it had abated the violations because it did not want OSHA to return to the plant." *Id.*

15

The Court also noted that the employer's safety manager at the time of the husband's death had "admitted in his deposition that he knew there was a substantial certainty that an employee could die" if those violations were not abated. *Id.* at 797. That admission, the Court held, "may be imputed to defendant because [the manager], as the environmental health and safety manager at defendant's company, was testifying on defendant's behalf." *Id.*

*Crippen* is distinguishable in several obvious respects. First, Alvarado is not a safety manager. Rather, he was the sanitation manager who supervised and assigned work to Rodriguez and his co-workers. What is more, Alvarado had never previously heard of LOTO until a few days before the incident. He has no OSHA-specific training or safety expertise, and there is nothing in the record to suggest that either Defendant employed him to oversee safety or compliance with OSHA's safety regulations. His testimony was not offered as the health and safety expert in charge at the time of Rodriguez's death, and Plaintiff has offered no legitimate reason to impute his admission to either Defendant.[3]

Critically, *Crippen* made clear that such an admission by itself is not sufficient. What defeated summary judgment was the employer's protracted refusal to correct its prior safety violations, all while deliberately deceiving OSHA into believing that they had been abated. *See id.* 799 (LaVecchia, J., concurring) ("Absent deception . . . this case would fall short of clearing the [NJWCA's] exclusivity bar."). No such willful or culpable misconduct occurred here. And although OSHA ultimately cited Safest-Way for its lack of LOTO procedures following Rodriguez's death, that does not "make-up for" the absence of "pre-accident OSHA citations or deception." *Fermaintt ex rel. Est. of Lawlor v. McWane, Inc.*, 694 F. Supp. 2d 339, 349 (D.N.J.

---

[3] Plaintiff's inclusion of an expert report to "corroborate what Alvarado knew" has no effect on this conclusion. *Busby,* 2024 WL 3648144, at *12 (holding that "consideration of [an] expert report . . . did not require the court to deny summary judgment").

2010). The same holds true even in cases where it is beyond dispute that those measures would have prevented the injury or death that ultimately occurred. *See Millison* 501 A.2d at 514 ("[T]he [NJWCA] is not circumvented simply because a known risk later blossoms into reality.").

Lastly, Plaintiff points to the fact that Fresh Foods' maintenance workers were the only employees working at its facility who were trained on and subjected to its LOTO procedures. Relying on that fact, and that fact alone, Plaintiff extrapolates with argument as follows:

> [Fresh Foods], through its CEO Frank Tedesco, actually made the conscious, deliberate and purposeful decision to protect one class of well-benefited workers – maintenance workers who were given individually numbered locks and tags to deenergize conveyors they repaired and maintained – but left another class of workers – the poorly-benefitted, largely Hispanic Labor Force sanitation workers exposed to the obvious, known, and fatal hazard of sanitizing and cleaning unguarded, moving, overly-energized conveyors without lockout/tagout. Not one reported case supports "employer" immunity under such diabolical circumstances.

(ECF No. 62 at 6.) This is quite obviously an *ad hominem* attack that is as much unhelpful as it is unwarranted. Plaintiff has not adduced the evidence that would permit him to even begin substantiating what he insinuates. Indeed, Plaintiff has not identified a single maintenance worker, much less contended that the relative risks here were identical. Clearly, Plaintiff's counsel has made certain stereotypical assumptions about both sets of workers and attempts to inject them into a legal inquiry where they do not belong. *See also GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 210 (3d Cir. 2001) ("[A] court is required to indulge only reasonable inferences[.]"); *Matsushita*, 475 U.S. at 586 (noting that non-moving parties must do more than articulate "some metaphysical doubt as to the material facts"); *Mumtaz v. Etihad Airways & Airlines*, No. 12-2051, 2014 WL 7405216, at *5 (D.N.J. Dec. 30, 2014 ("Plaintiff[s] [do not] create a genuine dispute of material fact by reasoning the evidentiary equivalent of "'Because I said so.'").

According to Fresh Foods, the maintenance employees were subjected to its LOTO protocols due to the particular risks they faced upkeeping and repairing the inner workings of its

17

machines. It reasons that sanitation workers were not subjected to those protocols because they performed different, less dangerous work (*e.g.*, hose-rinsing the machines). While Plaintiff is free to quarrel with the sagacity of Fresh Foods' calculation or its tolerance of safety risks, that is a dispute reserved for cases of negligence and recklessness, not intentional wrong. *See Busby*, 2024 WL 3648144, at *11 (enforcing NJWCA's exclusive-remedy provision against injured sanitation worker where "[m]echanics were the only employees trained on LOTO").

The intentional-wrong standard demands something more, something in addition to a miscalculation or tolerance of risk. It requires Plaintiff to come forward with evidence showing that Defendants committed an "affirmative, deliberate act" knowing that Rodriguez's death was "virtually certain" to occur. *Id.* That evidence cannot be created by emphatically pointing at the same, deficient safety protocols. Nor can negligence be transformed into an intentional wrong by cloaking it in loaded, unsubstantiated accusations that Defendants "intentionally withheld proper [LOTO] procedures" from Rodriguez (ECF No. 62 at 23), that it "threw its sanitation workers to the wolves [by] forcing them to clean moving conveyors" (*id.* at 17), or that it "left a 28-year-old sanitation employee to die" (*id.* at 24).[4] While the Court appreciates that Rodriguez's death was a significant tragedy, the intentional-wrong standard must nevertheless be satisfied with evidence, not rhetoric.[5]

In conclusion, Plaintiff has not come forward with the requisite evidence to proceed with his tort claims. The record does not reasonably justify a finding that Defendants committed a deliberate, affirmative act, or that it knew Rodriguez's death was virtually certain to occur. Plaintiff

---

[4] To be clear, the only time that sanitation workers were expected to clean a running conveyor machine was at the first step of cleaning (*i.e.*, when the conveyor belt was *attached* and the sprockets were *not* exposed). Plaintiff has not shown any evidence that Rodriguez was "forced" to clean an exposed, energized conveyor machine.

[5] In light of this holding, the Court need not address the context prong of the intentional-wrong analysis.

has not sustained his burden of satisfying the conduct prong of the intentional-wrong standard, and his claims against Defendants are thus barred by the NJWCA's exclusive-remedy provision. *See* N.J. STAT. ANN. § 34:15–8.

## V.     CONCLUSION

For all of the reasons set forth above, Defendants' Motions for Summary Judgment are accordingly granted.

Dated: September 27, 2024

*/s/ Karen M. Williams*
KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE